DONALD J. POCHOPIEN *et al.*, Plaintiffs-Appellants, v. THE REGIONAL BOARD OF SCHOOL TRUSTEES OF THE LAKE COUNTY EDUCATIONAL SERVICE REGION *et al.*, Defendants-Appellees.

Second District   No. 2—00—0386

Opinion filed April 24, 2001.—Rehearing denied June 15, 2001.

186

Dom J. Rizzi, of Miller, Faucher & Cafferty, L.L.P., of Chicago, for appellants.

Michael J. Waller, State's Attorney, of Waukegan (Karen D. Fox, Assistant State's Attorney, of counsel), for appellee Regional Board of School Trustees of Lake County Educational Service Region.

A. Lynn Himes and Alan M. Mullins, both of Scariano, Ellch, Himes,

Sraga & Petrarca, Chartered, of Chicago Heights, for appellee Board of Education of Fremont School District #79.

Mathias W. Delort and Heidi A. Katz, both of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for other appellees.

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiffs, Donald J. Pochopien *et al.*, appeal the circuit court's judgment affirming the decision of the Regional Board of School Trustees of the Lake County Educational Service Region (Regional Board) to deny plaintiffs' petition to detach the entire subdivision commonly known as "the Cobblestone of Long Grove" (Cobblestone) from Fremont School District 79 (District 79) and annex it to Kildeer Countryside Community Consolidated School District No. 96 (District 96).

## BACKGROUND

Although plaintiffs' petition, filed December 1, 1998, states nothing more specific than annexation to District 96 as its sought remedy, plaintiffs' design in filing the petition, as will be seen, was to have their children attend Country Meadows Elementary School (Country Meadows) and Woodlawn Middle School (Woodlawn) in District 96 (jointly Country-Woodlawn).

Cobblestone subdivision, comprised of 23 houses on a total of 32 lots, is in the Village of Long Grove and in District 79. Cobblestone's western boundary is shared not only by the boundary that partly forms the southeast corner of District 79 and the northwest corner of District 96, but also by the eastern boundary of the school grounds of Country Meadows and Woodlawn, both of which are in Long Grove. Country Meadows comprises grades one through three, and Woodlawn comprises grades four through eight. Country Meadows and Woodlawn both were built after Cobblestone was developed. Cobblestone is within a very short distance of the two schools.

Currently, Cobblestone has 22 school-age children. Cobblestone children in grades one through eight attend Fremont Elementary School and Fremont Middle School (jointly Fremont) in District 79, both of which are in the Village of Mundelein approximately 5.8 miles from Cobblestone. Depending on traffic, a one-way trip between Cobblestone and Fremont can range from 20 to 50 minutes. Approximately 30% of District 79 students attend Stevenson High School, which is also attended by all District 96 students, and the remaining students attend Mundelein High School. District 79 has an enrollment of 1,400 students, and District 96 has 3,716 students. Cobblestone students are the only Long Grove residents who attend school in District 79 rather than District 96.

At a hearing before the Regional Board, plaintiffs argued that, by being required to commute several miles to Fremont for school, Cobblestone children are placed at risk needlessly, given that Country-Woodlawn literally is next door to Cobblestone. The Regional Board accepted into evidence several letters, all dated before the petition was filed, that plaintiffs offered to show Long Grove's and District 96's mutual desire to foster a sense of community. In this correspondence, which deals with issues such as a proposed walking path between Cobblestone and Country-Woodlawn, District 96 welcomes the involvement of the Long Grove Park District in the development of the new schools (Country-Woodlawn) and expresses a desire to be a "good neighbor" to Cobblestone and an interest in having representatives on Long Grove village planning committees.

Over defendants' objection, the Regional Board admitted into evidence a document entitled "Financial Impact," which plaintiffs offered to show the fiscal consequences that detachment and annexation would have for District 79 and District 96. The document reflects that District 79's cost of educating each student in 1997 was $6,619, resulting in a total cost of $143,418 for educating 22 students (the number of students in Cobblestone). In 1997, District 79 received $108,200.40 in tax revenue from the 23 houses in Cobblestone (the average revenue per house in District 96 being $4,074 in 1997). Thus, in 1997, the cost of educating the Cobblestone students exceeded revenue derived from Cobblestone by $35,217.60. The document further shows that District 79's cost per student remained constant from 1997 to 1998 but that its tax revenue from Cobblestone increased to $122,312.40 in 1998. Thus, in 1998, District 79's cost of educating the 22 Cobblestone students exceeded the revenue the district received from the 23 Cobblestone houses by $21,106.

The document further shows that District 96's cost of educating each student in 1997 was $5,552, resulting in a total cost of $122,144 for educating 22 students (the number of students in Cobblestone) in 1997. Tax revenue per 23 houses (the number of houses in Cobblestone) in 1997 was $121,054.70 (the average revenue per house in District 96 being $5,263 in 1997). Thus, District 96's cost of educating 22 students in 1997 exceeded the revenue from 23 houses by $1,089.30. According to the document, District 96's tax revenue per 23 houses increased to $136,843.70 in 1998 while its cost of educating each student remained constant. Thus, in 1998, the revenue from 23 houses exceeded by $14,699.70 the cost of educating 22 students from a subdivision comprised of 23 homes.

Plaintiffs argued that these figures demonstrate that District 96 is better able financially to educate the 22 Cobblestone students than is

District 79, and that District 79 would in fact receive a financial benefit in the form of a decreased deficit from losing the Cobblestone students. Although the financial impact statement is ambiguous in parts, we interpret it as comparing District 79's costs versus the revenue derived from the 23 Cobblestone houses themselves against District 96's cost of educating 22 students versus its revenue derived per 23 houses, based on the average revenue per house in District 96. Although defendants objected to admission of the financial impact statement only on hearsay grounds, they also expressed an intent to challenge the substance of the document during their presentation by showing that it was "misleading" and that it "compared data from the wrong years." As we note below, defendants did not successfully follow through on this design.

District 79 presented the testimony of three witnesses: Dr. Gary Mical, superintendent for District 79; Karen Kolb, who has resided with her family in Cobblestone for seven years; and Andrew Rieder, president of District 79's board of education, father of four children who attend Fremont, and resident of Hawthorne Woods, located less than two miles northwest of Cobblestone.

Concerning District 79's revenue, Dr. Mical testified as follows. The district receives approximately $102,000 in tax revenue per year from Cobblestone and anticipates receiving $148,000 in revenue per year once Cobblestone is completely built. Approximately 30% of the 34 square miles in District 79 have been developed. Significant housing development near the eastern and western boundaries of the district is anticipated. There is the potential for "an enormous amount" of housing in the northern part of the district. Some parts of District 79, however, could end up in a tax increment financing district comprised of an industrial development. The development could employ anywhere between 9,000 and 12,000 people and would cause an intense population increase, an influx of students, and increased expenses. However, the development would not result in a revenue increase for about 23 years.

Dr. Mical testified that District 79 anticipated an increase of approximately 10%, or 300 students, per year. Asked on cross-examination whether the loss of the 22 Cobblestone students would be significant when compared to the estimated 300 students to be gained each year, Dr. Mical stated that "if it is a question of losing 22 students versus gaining 300 students, obviously the numbers are fairly easy to be able to determine. Three hundred students means it is going to have a lot more effect on losing 22 students." Dr. Mical's answer is somewhat ambiguous and was not clarified by follow-up questions, but we interpret Dr. Mical as saying that the projected gain of 300 students would bring a gain in revenue to offset the loss of Cobblestone students

and would not simply increase costs. Thus, we consider the gain of 300 students not to be part of the tax increment financing district described by Dr. Mical.

Dr. Mical testified that the district just completed construction on a $12.5 million elementary school building. The students from Cobblestone were considered in the planning of this building, as was the tax revenue from Cobblestone. District 79 plans to build another elementary school building, but since it has been deficit spending at the rate of $800,000 and projects a deficit next year of $1.3 million, it anticipates asking voters for a tax increase. If the referendum fails, then the district "will be faced with the possibility of having significant cuts to [its] programs."

Dr. Mical testified that the detachment of Cobblestone would have "a negligible effect" on the district's costs, although it would cause a loss of revenue. A charter school recently was approved by the State Board of Education for District 79, which will result in a loss of 60 students and a maximum of $400,000 in revenue but will have no impact on the costs of the district. Dr. Mical stated that "[a]ny loss of revenue at this particular time will have a deleterious effect" on the district.

Asked to compare District 79 and District 96 in terms of educational resources, Dr. Mical testified that District 96 is "really almost a mirror district" to District 79 in terms of curriculum. There are no significant differences between the facilities of the two districts. Dr. Mical testified that he was unaware of complaints from Cobblestone parents regarding the commute to Fremont.

Kolb and Reider testified that their children were not hindered in their participation in extracurricular activities at Fremont and in essence that they shopped, dined and otherwise recreated in several nearby communities. Kolb conceded that she could not give an opinion as to the extent to which Cobblestone residents in general patronize Long Grove businesses and participate in Long Grove activities.

District 96 presented three witnesses: Dr. Many, superintendent of District 96; Kent Blake, assistant superintendent for business for District 96; and Dr. Walter Friker, assistant superintendent for instruction for District 96, secretary and president-elect of the Long Grove Rotary Club, and a resident of Palatine.

Dr. Many testified that, when District 96 determined which areas of the district would feed into Country Meadows, it did not consider Cobblestone. Dr. Many testified that if Cobblestone were annexed, District 96 would construct no new facilities. Additional part-time teachers might be hired, depending on where the students were assigned and on final enrollments. Although Dr. Many stated that he

"would be concerned that students were leaving one district and joining a new district," he conceded that he could not identify the cause for his concern. Dr. Many testified that there would be no guarantee that Cobblestone students would attend the District 96 schools closest to them. He did not identify the basis for this statement. Dr. Many also testified that District 96, unlike District 79, has a "cut policy" in athletics: students compete for positions on the teams. Dr. Many stated that Cobblestone kindergartners would have to attend a kindergarten facility in the southeast corner of District 96.

Blake testified that District 96 recently voted not to increase taxes with the understanding that the district boundaries would remain stable. Blake stated that District 96 is levying at the maximum rate in its education fund but at slightly below the maximum in its operations fund and transportation fund. Blake stated that he questioned plaintiffs' financial impact statement because it showed "revenue as opposed to *** expenses," but he was not asked to elaborate on this comment. He also testified that he thought the statement was flawed because it showed costs as remaining constant from 1997 to 1998. On cross-examination, Blake admitted that he was not certain that the cost of educating each student would not remain the same from 1997 to 1998, but stated it was his "professional opinion" that there would be an increase based on past increases of about 5% per year.

Dr. Friker testified that his involvement with the Rotary Club has given him "some familiarity" with the community trends in the area of Long Grove. He stated that, based on his experience with the Rotary Club, which involved "dealing with the actual business persons of Long Grove at the leadership level," he believed that Kolb's description of the shopping trends in the area was "essentially accurate." Dr. Friker testified that District 79 and District 96 are "very, very similar" in terms of their compliance with state-mandated criteria and are "both quality districts that offer students comparable programs." Dr. Friker stated that transferring Cobblestone children into District 96 "would not have a negative affect [sic] on their educational achievement."

Following the testimony of the parties, 10 residents of Cobblestone voiced their support for the petition. Their concerns centered around the distance of Fremont from Cobblestone, which, they claimed, not only endangers Cobblestone students by necessitating a lengthy commute but also prevents some of the students from participating in some after-school activities and promotes a sense of isolation from Fremont. They observed, *inter alia*, that their local newspaper does not cover news concerning Fremont, that transportation to Fremont presented serious problems and prevented some children from

extracurricular participation, and that current boundaries required Cobblestone students to attend a high school different from that attended by most of their middle school classmates.

In this timely appeal, plaintiffs argue that the decision of the Regional Board was against the manifest weight of the evidence. They argue that the record clearly demonstrated that detachment and annexation would be in the best interests of the Cobblestone children and would have minimal negative impact on District 79 and District 96. Plaintiffs also argue that the Regional Board members improperly based their decision on the precedential potential of granting the petition, *i.e.*, the "domino effect."

In response, defendants argue that the Regional Board's decision was not against the manifest weight of the evidence. Defendants submit that plaintiffs did not establish that the Cobblestone subdivision has a community of interest in Long Grove rather than in the surrounding areas. Defendants also assert that the financial impact of detachment on District 79 would outweigh any benefit to Cobblestone and District 96. Lastly, defendants deny that the Regional Board's decision was based on the "domino effect." Because we reverse the Regional Board's decision on independent grounds, as set forth below, we do not consider whether the Regional Board relied on the "domino effect."

## ANALYSIS

█ School district boundary changes are governed by section 7—01 *et seq.* of the School Code (Code) (105 ILCS 5/7—01 *et seq.* (West 1998)). Plaintiffs filed their petition under section 7—1 of the Code, which provides for the alteration of school district boundaries lying entirely within any educational service region. 105 ILCS 5/7—1 (West 1998). Section 7—6(i) of the Code provides that, at a hearing on a petition for detachment and annexation filed under section 7—1, the regional board of school trustees

"shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the State Board of Education, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is to the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted." 105 ILCS 5/7—6(i) (West 1998).

The parties seeking annexation and detachment have the burden of proving that "the overall benefit to the annexing district and the detachment area clearly outweighs the resulting detriment to the los-

ing district and the surrounding community as a whole." *Carver v. Bond/Fayette/Effingham Regional Board of School Trustees*, 146 Ill. 2d 347, 356 (1992). Petitioners must prove their case by a preponderance of the evidence. See 5 ILCS 100/10—15 (West 1998). The party bearing the burden of proof retains throughout the proceedings the burden of persuasion as to the facts underlying its claim. *Ambrose v. Thornton Township School Trustees*, 274 Ill. App. 3d 676, 680 (1995). The party also bears initially the burden of production, which it satisfies by presenting sufficient evidence on each element of its cause of action to establish a *prima facie* case. *Ambrose*, 274 Ill. App. 3d at 680. A *prima facie* case is made by evidence that would enable the trier of fact to find each element of the cause of action more probably true than not. *Anderson v. Department of Public Property*, 140 Ill. App. 3d 772, 778 (1986). If the opposing party produces no evidence that contradicts or impeaches this evidence, the trier of fact must rule for the burdened party. *Anderson*, 140 Ill. App. 3d at 778.

■ A regional board of school trustees' decision on a petition for detachment and annexation is an administrative decision for purposes of the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)). See 105 ILCS 5/7—7 (West 1998). A reviewing court considers the factual findings of an administrative agency to be *prima facie* true and correct. 735 ILCS 5/3—110 (West 1994). The reversal of an administrative agency's factual finding is warranted only where the finding is against the manifest weight of the evidence and it is clearly evident that the agency should have reached the opposite conclusion. *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 507 (1990). Decisions of an administrative agency on questions of law, such as the interpretation of a statute, are reviewed *de novo. City of Freeport*, 135 Ill. 2d at 507.

■ In balancing the benefit to the annexing district and to the detachment area against the detriment to the detaching district and to the surrounding community as a whole, regional boards and the courts reviewing their actions should consider the following factors: the differences between school facilities and curricula; the distances from the petitioners' homes to the respective schools; the effect detachment would have on the ability of either district to meet State standards of recognition; and the impact of the proposed boundary change on the tax revenues of both districts. *Carver*, 146 Ill. 2d at 356. The mere absence of substantial detriment to either district is not sufficient to support a petition for detachment and annexation. *Carver*, 146 Ill. 2d at 358. However, petitioners need not demonstrate a particular benefit to the annexing district as long as the overall benefit to the annexing district and the detachment area considered together outweighs the

resulting detriment to the losing district and the surrounding community as a whole. *Carver*, 146 Ill. 2d at 358, citing *Board of Education of Golf School District No. 67 v. Regional Board of School Trustees*, 89 Ill. 2d 392, 400-01 (1982). In the absence of substantial detriment to either school district, some benefit to the educational welfare of the students in the detachment area is sufficient to warrant the granting of a petition for detachment. *Carver*, 146 Ill. 2d at 358.

The *Carver* court provided some admonitions on how the balancing test and relevant factors should be applied. The loss of revenue is not a determinative factor in detachment proceedings and alone will not prevent a boundary change if the district subject to detachment is not levying at the maximum tax rate. *Carver*, 146 Ill. 2d at 356. Whether a detaching district can remain financially viable and able to comply with statutory standards for recognition is more important than the size of the loss of tax revenues and assessed valuation. *Carver*, 146 Ill. 2d at 356-57. Although financial loss to the detaching district is not irrelevant, it cannot serve as the basis for a denial of detachment unless it is serious. *Carver*, 146 Ill. 2d at 357.

Educational welfare is to be broadly interpreted. *Carver*, 146 Ill. 2d at 359. Students' educational welfare is bettered not just through improved educational programs or facilities. *Carver*, 146 Ill. 2d at 359-60. Betterment may also occur by way of a shortened distance between students' homes and their school. *Carver*, 146 Ill. 2d at 359-60; see also *Golf*, 89 Ill. 2d at 400 ("Students from the detachment area would benefit by improved safety conditions in traveling to and from school"); *Burnidge v. County Board of School Trustees*, 25 Ill. App. 2d 503, 509 (1960) ("In addition to the savings in transportation costs, and diminution in time spent daily by children riding a bus, there would be a certain safety factor by reason of diminution of exposure and certainly a lessening of fatigue accompanying a long bus ride to and from school"); *Board of Education of Jonesboro Community Consolidated School District No. 43 v. Regional Board of School Trustees*, 86 Ill. App. 3d 230, 234 (1980) (benefit of shorter distance to school "would be reflected in time, safety, effort, and expense"). A reduction in travel time, however, is not sufficient by itself to justify a boundary change. *First National Bank v. West Aurora School District 129*, 200 Ill. App. 3d 210, 217 (1990); *Fixmer v. Regional Board of School Trustees*, 146 Ill. App. 3d 660, 665 (1986). Although relevant, the personal preferences of the petitioners as to shopping, banking, *et cetera*, are not a sufficient basis for granting a petition. *Carver*, 146 Ill. 2d at 356, 358.

Students' educational welfare can also be improved through an increased identification with their "natural community center," which

would increase participation in school and extracurricular activities. *Carver*, 146 Ill. 2d at 360. In *Burnidge*, the court observed that a student's close proximity to his school can foster an identification with his natural community center and that the resulting increased participation in school activities "cannot but result in an improvement in the educational picture of the entire area." *Burnidge*, 25 Ill. App. 2d at 509-10. By contrast, "an unnatural identification with a school district would have an opposite result with a corresponding loss of participation and resulting poorer educational picture." *Burnidge*, 25 Ill. App. 2d at 510.

■ We conclude that the Regional Board's decision denying plaintiffs' petition was against the manifest weight of the evidence. Specifically, we determine that plaintiffs made a *prima facie* case for detachment and annexation that defendants did not contradict or impeach. We note that there is no factual dispute with respect to three of the four *Carver* factors. First, the parties agree that the curricula and facilities of District 79 and District 96 are not significantly different. Second, defendants adduced no evidence that detachment and annexation of Cobblestone would prevent either district from complying with state standards. Third, it is undisputed that Cobblestone students currently undergo a significant commute to District 79 elementary and secondary schools. It is also undisputed that District 96 has both an elementary school and a secondary school located on the lot contiguous to Cobblestone and that Cobblestone students are the only Long Grove residents who attend school in District 79 rather than District 96.

There was testimony that travel to and from Fremont can be extremely onerous when traffic is heavy and that the duration of the commute is preventing some students from participating in after-school activities. There also was testimony that some Cobblestone children have had trouble coping with their friends' attending a different high school from theirs upon graduation from Fremont. Cobblestone students, the parties agree, would all attend the same high school if Cobblestone were annexed to District 96. There also was testimony that the distance from Fremont is creating a sense of isolation in Cobblestone and that Fremont events and activities are not covered in the Long Grove newspaper.

We find that Cobblestone's presence in District 79 has created a situation, contemplated by *Burnidge*, in which students, forced to commute to a school well outside their neighborhood, are suffering from an unnatural identification with a school district that is not within their community center. See *Burnidge*, 25 Ill. App. 2d at 510. We believe that permitting Cobblestone children to attend the District

96 schools in their neighborhood would facilitate their participation in extracurricular activities, thereby making them more fulfilled students. Moreover, District 96 clearly would be benefitted by the contributions of Cobblestone students.

Ironically, the benefits of Cobblestone children attending the District 96 schools contiguous to their subdivision was at one time recognized by District 96 itself. Plaintiffs introduced evidence that the desire to foster a sense of community between Cobblestone and Country-Woodlawn was reciprocal. In light of the obvious advantages of children attending a school only a short distance from their homes, we hardly are surprised that we cannot find another case in this state dealing with a situation in which a school district has opposed a petition to annex a subdivision located literally next door to a school in that district. It is as much the distance between Cobblestone and Country-Woodlawn as it is the distance between Cobblestone and Fremont that makes plaintiffs' petition compelling.

As for the remaining factor—the financial impact of annexation and detachment—plaintiffs presented evidence that District 79 currently is running a deficit in the education of Cobblestone students and would benefit financially if relieved of the cost of educating these students. Indeed, that District 79, with an enrollment of 1,400, would be financially harmed in a significant way by the loss of 22 students is manifestly implausible, especially in light of its projected growth of 300 students per year.

Based on the foregoing, we conclude that plaintiffs produced a *prima facie* case that granting their petition clearly would benefit Cobblestone and District 96 more than that it would harm District 79 and the surrounding community. Defendants did not contradict this *prima facie* case. They presented no evidence that Cobblestone residents generally would not benefit from inclusion in District 96. Kolb and Rieder, who testified that the distance between Cobblestone and Fremont has not prevented their children from participating in Fremont activities and that they could think of no significant benefit that annexation to District 79 would confer on Cobblestone children, spoke for no one but themselves and their own families. Moreover, Rieder did not indicate how he, a resident of Hawthorne Woods, could be taken to represent the views of Cobblestone residents.

Also inconsequential were defendants' attempts to show that Cobblestone residents do not consider Long Grove their community of interest. Kolb and Rieder testified that their families have little to do with Long Grove. However, Kolb testified only for herself and her family and expressly admitted that she was unable to speak for Cobblestone generally. She certainly did not speak for Helen Pochopien, a

resident of Cobblestone who testified that she regularly shops in Long Grove. Rieder, a resident of Hawthorne Woods, did not establish how he could represent the views of Long Grove residents, much less Cobblestone residents. Dr. Friker testified that, as a member of the Rotary Club, he thought that Kolb's description of the "shopping trends" in Cobblestone was "essentially accurate." Kolb, however, did not testify about general Cobblestone shopping trends. Nor, quite obviously, is a municipality's sense of community built only on shopping.

Defendants did not rebut plaintiffs' evidence concerning the financial detriment the districts would suffer if Cobblestone were detached. Blake, the sole witness to address plaintiffs' financial impact statement, testified that it showed District 96's "revenue as opposed to expenses," but he did not develop this bare comment enough to show what weight it might have. Blake criticized the financial impact statement for indicating that District 96's costs would not increase between 1997 and 1998, but he conceded that he was not certain that costs would not remain static. Also, Blake made no comment at all on the accuracy of the financial data for District 79.

Defendants presented evidence that the detachment of Cobblestone would deprive District 79 of $102,000 in revenue, but we are unable to understand the significance of this figure because defendants did not produce evidence of District 79's total yearly revenue to place the figure in perspective. Defendants cite no cases giving us the authority to deem District 79's projected loss of revenue as serious without our knowing what portion of District 79's total yearly revenue this loss would comprise. Defendants' opposition to the petition is weakened further by the complete absence from the record of evidence that this loss would preclude District 79 from complying with state standards. See *Carver*, 146 Ill. 2d at 356-57. Lastly, District 79's claim that the loss of the 22 Cobblestone students would cause significant revenue loss is countered by its admission that it projects growth at the rate of 300 students per year with a corresponding increase in revenue.

Defendants also presented no evidence that the annexation of Cobblestone would deleteriously affect District 96. Dr. Many testified that the only foreseeable change might be an increase in part-time teachers, which would depend on where the students were assigned and on the final enrollments. Blake testified that District 96 had extended its existing debt in the expectation that its boundaries would remain constant, but he did not explain how this reliance would translate into a financial detriment to District 96 if annexation occurred. Most significantly, defendants failed to explain what negative effect annexation would have on District 96's ability to comply with state standards. See *Carver*, 146 Ill. 2d at 356-57.

Based on the foregoing, we conclude that defendants not only failed to rebut plaintiffs' calculation of the financial consequences of the proposed boundary change but they also generally failed to present evidence that the boundary change would result in serious financial detriment to either school district or would prevent either district from complying with state standards. Thus, defendants have failed to prove financial detriment sufficient to support the denial of plaintiffs' petition. See *Carver*, 146 Ill. 2d at 356-57.

We are mindful of Dr. Many's testimony that there is no guarantee that Cobblestone children would be able to attend Country Meadows and Woodlawn if the petition was granted. However, Dr. Many did not support this assertion with a reference to an extrinsic source. Although we cannot discern the attendance boundaries for Country-Woodlawn from the record, we find incredible the suggestion that Cobblestone children would not be within the attendance boundaries for these schools after annexation.

We also recognize that annexation to District 96 would force Cobblestone students to compete for positions on athletic teams whereas, in District 79, every student is guaranteed a position. A school's athletic programs, of course, are only one element of its educational mission. Moreover, it is far better for a student to undergo tryouts than to be unable to participate in an athletic program simply because his school is too far away from his home, as is happening currently to some Cobblestone students.

Finally, we recognize that Cobblestone kindergarten students would be bused to a school in the southern portion of District 96 were Cobblestone annexed. These students, however, would each have to endure only one year of commuting as opposed to the several years of commuting currently endured by each elementary and middle school child from Cobblestone. Moreover, there is no evidence in the record that the commute to District 96's kindergarten facility would be any longer than the commute to District 79's kindergarten facility.

In conclusion, defendants have failed to counter plaintiffs' *prima facie* showing that the significant distance between Fremont and Cobblestone has hindered Cobblestone children's opportunity to participate in school activities and caused them to feel isolated from their school. Plaintiffs also have shown that annexation to District 96 would eliminate these problems by placing Cobblestone students in a school located within their natural community center. Defendants also failed to counter plaintiffs' *prima facie* case by demonstrating a level of financial impact that would hinder either district's ability to comply with state standards. We conclude that plaintiffs clearly demonstrated that the benefits of detachment and annexation outweigh any detri-

ments. Accordingly, we hold that the Regional Board's denial of plaintiffs' petition was against the manifest weight of the evidence.

The judgment of the circuit court of Lake County is reversed.

Reversed.

McLAREN and RAPP, JJ., concur.