# Illinois Official Reports

## Appellate Court

---

**Merchant v. Regional Board of School Trustees**, 2014 IL App (2d) 131277

---

| | |
|---|---|
| Appellate Court Caption | AYAZ MERCHANT, CHARLES T. TAYLOR, CHERYL D. TAYLOR, ELSIE I. DIETZ, DOROTHY B. TAYLOR, THOMAS F. EARTH, MARIA G. EARTH, ANAND K. PATEL, PINAL PATEL, and DAWN DAHL, as the Statutory "Committee of 10," Petitioners-Appellees, v. REGIONAL BOARD OF SCHOOL TRUSTEES OF LAKE COUNTY, ILLINOIS; ALLISON BAKER-FRANK, Board President; DON FONTANA, Trustee; JULIE GONKA, Trustee; LARRY McSHANE, Trustee; BARRY J. CARROL, Trustee; ROY E. LUCKE, Trustee; JAMES C. MITCHELL, JR., Trustee; ROYCEALEE J. WOOD, *ex officio* Member, All in Their Official Capacities, Respondents (Woodland Community Consolidated School District 50, Oak Grove School District 68, Warren Township High School District 121, and Libertyville Community High School District 128, Respondents-Appellants). |
| District & No. | Second District<br>Docket No. 2-13-1277 |
| Filed | September 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In proceedings on a petition to detach petitioners' subdivision from one set of school districts and annex it to another set of districts, the appellate court upheld the trial court's reversal of the regional board of school trustees' denial of the petition, since travel times and distances to schools would be improved by granting the petition, the regional board erred in weighing the "community of interest" and "whole child" factors and finding that the students represented by petitioners did not have a strong community of interest with schools they sought to join, and the regional board also erred in failing to consider evidence of the potential for increases in the property values for the petitioning subdivision if the petition was granted; furthermore, the evidence of petitioners' preferences was not controverted, and there was evidence showing that petitioners' students would receive some educational benefit if the petition was granted. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 13-MR-237; the Hon. Diane E. Winter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | A. Lynn Himes and Alan M. Mullins, both of Scariano, Himes & Petrarca, Chtrd., of Chicago, for appellants. |
| | James P. Bartley and Jacob H. Karaca, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion. Justices McLaren and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1      Petitioners, Ayaz Merchant, Charles T. Taylor, Cheryl D. Taylor, Elsie I. Dietz, Dorothy B. Taylor, Thomas F. Earth, Maria G. Earth, Anand K. Patel, Pinal Patel, and Dawn Dahl, as a "Committee of 10" pursuant to section 7-6(c) of the Illinois School Code (105 ILCS 5/7-6(c) (West 2012)), sought to detach their territory, commonly known as the Lancaster subdivision, from the boundaries of respondents Woodland Community Consolidated School District 50 (Woodland) and Warren Township High School District 121 (Warren) and annex it into the boundaries of respondents Oak Grove School District 68 (Oak Grove) and Libertyville Community High School District 128 (Libertyville). Pursuant to section 7-1 of the School Code (105 ILCS 5/7-1 (West 2012)), petitioners filed a petition with respondent the Regional Board of School Trustees of Lake County (Regional Board or Board). The Regional Board conducted a hearing over five evenings. Woodland, Warren, Oak Grove, and Libertyville (school districts or districts) opposed the petition. The Regional Board denied the petition.

¶ 2      On administrative review, the trial court reversed the Regional Board's decision. The school districts appeal, arguing that the Regional Board correctly denied the petition. We affirm the trial court's order reversing the Regional Board's decision.

¶ 3                 I. BACKGROUND

¶ 4      The Lancaster subdivision is located in the southeastern part of Warren Township and, although it has a Libertyville mailing address, is part of the City of Waukegan. Lancaster,

which is triangular, is bounded on the east by the Tri-State Tollway (I-94) and on the west by O'Plaine Road. The southern boundary of the territory is the Warren Township boundary line, and on the other side of that line is the Regency Woods subdivision, which is located within the boundaries of Oak Grove and Libertyville.

¶ 5 Lancaster contains approximately 80 single-family homes. There are 95 children in the subdivision, with 24 attending kindergarten through eighth grade at the Woodland schools and 15 attending Warren Township High School (WHS).

¶ 6 Woodland has an enrollment of 6,713 students in four schools: primary (pre-kindergarten and kindergarten), elementary (grades one through three), intermediate (grades four and five), and middle (grades six through eight). Oak Grove has one school building (Oak Grove school), serving students in kindergarten through grade eight. Its student enrollment has declined from 1,081 in 2005 to 838 in 2012. WHS is a two-campus high school (O'Plaine for freshmen and sophomores and Almond for the older students) and has about 4,500 students. Libertyville High School's (LHS's) enrollment at its single campus is about 2,000 students.

¶ 7 On June 25, 2012, petitioners filed their petition seeking detachment from Woodland and Warren and annexation to Oak Grove and Libertyville, all in Lake County. 105 ILCS 5/7-1 (West 2012) (providing for alteration of school district boundaries lying entirely within one educational service region). The petition was signed by at least two-thirds of Lancaster's registered voters, and the signers were represented by petitioners.

¶ 8 The hearing on the petition was conducted before the Regional Board on October 1 and 30, November 13 and 26, and December 4, 2012. At the hearing, petitioners presented evidence on five issues: (1) whether there would be an educational advantage to the Lancaster students if they went to Oak Grove school and LHS; (2) travel distances and times from Lancaster to the desired schools; (3) whether Lancaster has a community of interest with the City of Libertyville; (4) the potential increase in Lancaster home values if the petition were granted; and (5) petitioners' school preferences. The school districts presented evidence on the first three issues and stipulated that there would be no financial detriment to any of the school districts if the petition were granted.

¶ 9 A. Educational Advantage

¶ 10 Petitioners presented Timothy F. Brown's testimony and report. Brown is chair of the department of education at Argosy University's Chicago campus and has a doctorate in secondary education and curriculum from Indiana University. He opined that the Lancaster students would receive a better education at Oak Grove school and LHS than at the Woodland schools and WHS. He based his opinion on "data the literature shows as being indicative of school quality: student mathematics achievement scores, student cohort size and student engagement." Brown testified that studies have concluded that mathematics achievement is influenced more by teacher instruction than is achievement in other academic areas; in other words, mathematics achievement is not as influenced by socioeconomic conditions. He compared the percentages of students who over a four-year period met or exceeded state standards for mathematics at the Woodland schools and Oak Grove school, and he testified that Oak Grove's percentages were higher.

¶ 11 Brown further stated that studies of the connection of class and school size to student achievement have been inconclusive but that there is growing evidence that student cohort size (*i.e.*, the number of students in the same grade housed in the same school) impacts

student achievement. In elementary school, he noted, the primary relationship is between the teacher and the student and, thus, class size is very important. Cohort size becomes more important as students approach middle school, because the curriculum is departmentalized and students move about their schools in the course of the day. The larger the cohort, the less opportunity for students to engage with adults. Brown concluded that the cohorts for the Woodland schools and WHS were significantly larger than those for Oak Grove school and LHS.

¶ 12 Regarding student engagement (*i.e.*, student involvement with adults and other students in the school, including academic, cocurricular, and extra classroom engagement), Brown opined that studies reflected that this factor predicts school safety, student achievement, and, possibly, postsecondary school success. He explained that there are three elements of student engagement: teacher experience (faculty stability and educational level and adult-to-child ratio), delinquent behavior, and parental involvement.

¶ 13 He testified that, at Oak Grove school and LHS, teachers have more teaching experience and a higher percentage of master's degrees and there are fewer students per adult than at Woodland and WHS. WHS has a higher chronic truancy rate (*i.e.*, the percentage of the student body that has been absent from school for 10% or more of the time) than LHS, as reflected in the schools' state report cards. This is an indicator of lack of engagement. The four-year (2008 through 2011) average chronic truancy rate was 10.9% for WHS and 0.4% for LHS; the state average was 3.3%.

¶ 14 He opined that, based on the three indicators of school quality (math scores, cohort size, and student engagement), there would be "higher expectations for quality" at Oak Grove and LHS than at the Woodland schools and WHS. However, Brown also testified that petitioners were highly committed, which trumped all other indicators of student success. He noted that petitioners initiated the present (and one previous) detachment petition, and, in his report, he stated that petitioners "feel passionately" about their children's education and that parents "who choose the school for their children have an investment that is powerful."

¶ 15 Brown further testified that most teachers earn their master's degrees by going to school at night during the school year and that this "creates an environment where they can be bifurcated in their responsibilities." Thus, teachers who have already earned their master's degrees can give more attention to the school and their students.

¶ 16 On cross-examination, Brown explained that, in forming his opinions, he did not focus on "Adequate Yearly Progress" (AYP)[1] ratings as an indicator of school success, because one subgroup's failure to meet AYP criteria can cause an entire school not to meet them and "that may or may not be reflective of the whole school." Brown also denied that he based his conclusions on the differences in test scores between the subject schools; he explained that this was only one factor and that he focused on a pattern of differences in only math scores. He further explained that one cannot draw statistical comparisons, because the numbers of subjects in the relevant groups is different.

---

[1]Under Title I of the No Child Left Behind Act of 2001 (20 U.S.C. § 6301 *et seq.* (2012)), "Adequate Yearly Progress," as measured by federally approved standardized tests, is the benchmark by which schools and school districts are held accountable for student performance. The Woodland schools have never met the AYP criteria, whereas Oak Grove school has done so every year. WHS has never met the criteria, whereas LHS has done so every year but one.

¶ 17    Petitioners presented the four districts' 2008 to 2011 state report cards on criteria including student performance, pupil-to-teacher ratio, pupil-to-administrator ratio, teacher experience, and number of teachers with advanced degrees. Ayaz Merchant prepared petitioners' exhibit Nos. 14 and 15, which summarized this data. He testified that Oak Grove school performed better than the Woodland schools on all of the criteria and that LHS performed better than WHS on all of the criteria. Anand Patel conducted an Internet search of the schools' ratings (presented in petitioners' exhibit No. 16) from sources such as greatschools.org, chicagomag.com, usnews.com, thedailybeast.com, schooldigger.com, suntimes.com, and chicagotribune.com. He testified that overall Oak Grove school is ranked higher than the Woodland schools and that LHS is ranked higher than WHS.

¶ 18    The school districts' evidence on educational advantage was as follows. Mary Perry-Bates, the interim superintendent for WHS, testified that she took courses on academic research and conducted such research during her master's and doctoral studies. She reviewed Brown's report and the abstracts of the studies cited therein. Perry-Bates opined that a significant number of Brown's opinions were unsupported or contradicted by the research he cited. Specifically, she challenged his statement that mathematics achievement is influenced more by teacher instruction than is achievement in other subjects. According to Perry-Bates, Brown cited only one study, which actually examined how socioeconomic status is associated with continued learning over the summer. She also pointed to Brown's statement that student engagement is an indicator of reduced student victimization, increased student achievement, and postsecondary student success. Perry-Bates opined that Brown's cited studies did not draw this conclusion. She stated in her report that the authors of one study noted that mathematics achievement and school and cohort size are related to student engagement, not student performance, as Brown had represented. She also noted that several of his statements were unsubstantiated personal opinions, including that larger cohorts increase the chances of student anonymity and lack of school involvement and that student anonymity and lack of involvement are indicators of poor student engagement. Perry-Bates did not offer her own opinions on the issues Brown presented, and petitioners were not permitted to question her on this topic.

¶ 19    Prentiss Lea, superintendent of Libertyville, testified that he disagreed with petitioners' assertion that the Lancaster children would receive a better education at LHS than they would at WHS; in his view, the education provided at WHS was "similarly excellent." WHS and LHS, Lea stated, have very similar program offerings. He noted that 9 of the 15 Lancaster students at WHS are in advanced placement (AP) courses and that WHS has a pass rate (*i.e.*, scoring a 3, 4, or 5 on a national test) of 89% versus 91% at LHS. The 89% pass rate places WHS in the top 10% of Illinois schools.

¶ 20    Lea testified that the schools' state report cards cannot be read to reflect that LHS students receive a better education than WHS students. In his view, the differences in the teacher-to-student ratios are not significant, there is no research that defines how such differences affect education quality, and the average scores on all criteria show that the differences have no effect. Lea noted that, in the high school report card data summarized in petitioners' exhibit No. 15, demographic data, a critical factor, was missing from the summary. He explained that 16% of the students at WHS are of low socioeconomic status (SES) and that 2% have limited English-language proficiency. Historically, students of low SES and with limited English proficiency do not perform as well on standardized tests as do

other students. At LHS, only 5% of students are of low SES, and only 0.4% have limited English proficiency. Lea noted that it is very difficult to compare the schools, given the demographic differences.

¶ 21 Lea testified that, to determine whether WHS's teachers were doing as good a job as LHS's teachers, one should look at how individual students' needs are being met. This data is not reflected, Lea stated, in petitioners' exhibit. Lea pointed to the state report cards' data in mathematics and reading. He agreed that one also could look at the Prairie State Achievement Examination (PSAE) test results. Petitioners' exhibit No. 13 reflected that the 2010-11 PSAE reading score for WHS was 160, whereas for LHS it was 167. The mathematics score for WHS was 162, whereas LHS had a score of 169. WHS's science score was 163 and LHS's score was 169. Lea opined that the test results reflect that there is not a lot of difference between the schools.

¶ 22 Lea also testified to the PSAE scores showing the percentages of students meeting or exceeding standards. For the 2009-10 school year, in reading, WHS scored 64.1% and LHS scored 81.2%; in mathematics, WHS scored 63.9% and LHS scored 83%; and in science, WHS scored 65.3% and LHS scored 83.1%. For the 2010-11 school year, the reading score for WHS was 65.9% and for LHS it was 79.5%; in mathematics, WHS scored 68.2% and LHS scored 80.9%; and in science, WHS scored 65.2% and LHS scored 81.3%.

¶ 23 Lea further testified that, since 2003 and until two or three years ago, all Libertyville schools met AYP criteria. (The standards have gone up every year.) WHS has never met them. As to Internet rankings, Lea does not find them reliable, because the qualifications of the rankers are unknown, the criteria are unspecified, and it is unclear if the criteria are valid. He also noted that no one from the websites made any official visits to the district or contacted him or other Libertyville school personnel to obtain information about the district.

¶ 24 As to pupil-to-teacher ratios, Lea noted that the data (in petitioners' exhibit No. 15) reflected that, for 2008 through 2011, the average ratio was 19.83 to 1 for WHS and 16.88 to 1 for LHS. Lea opined that the three-student difference was not significant at the high school level. As to teacher experience, the data showed that teachers had an average of 10.65 years at WHS and 12.95 at LHS. Again, Lea opined that this did not imply that LHS students receive a better education than WHS students. Teachers with either level of experience have gone through the evaluation and tenure process, so the difference should not affect the quality of teaching. As to the fact that more teachers at LHS have master's degrees, Lea testified that the degree does not alone make a better teacher. Also, the data does not reflect the subject areas (*e.g.*, administration or mathematics) in which the master's degrees were earned. Similarly, he opined that higher teacher salaries do not reflect that students receive a better education. "The bottom line with teachers is the quality of the teacher you have, the commitment to their students, and the work that they do to help their students grow and increase their achievement."

¶ 25 The *U.S. News & World Report* magazine ranks LHS as the seventeenth best high school in the state. Lea stated that, although the ranking is good and LHS is ranked higher than WHS, he does not believe that the Lancaster students would get a better education at LHS. The quality of the education a student receives depends on that student and what the school does to meet that student's needs. When asked "So other than that, it doesn't matter what school you go to?" Lea responded, "I would say correct."

¶ 26 Mark Clement, assistant superintendent for teaching and learning at Oak Grove, agreed with Lea that the school report cards for Woodland and Oak Grove cannot be compared to assess which schools are better, because the schools and the school districts have different populations. Clement testified that about 29% of Woodland's students are of low SES whereas about 0.1% of Oak Grove's students are. He agreed with Lea that low SES students historically do not perform as well on standardized exams as do other students. He also noted that 12.5% of Woodland's students have limited English proficiency compared to only 2.2% at Oak Grove.

¶ 27 To address Brown's report, Clement helped prepare respondents' exhibit Nos. 3 and 4, which contain data from the Illinois Interactive Report Card. The exhibits compare data for Woodland and Oak Grove, including demographics and student performance. Exhibit No. 4 shows the 2007 to 2012 mathematics performance scores of students in grades three through eight at both districts, with the scores of low SES students excluded. (There are no low SES students in the Lancaster subdivision.) Clement testified that all of the scores are over 90 and are in similar ranges.[2] Clement opined that this data is a more "apples to apples" comparison than Brown's data, because it compares like populations within the districts. Clement concluded that the Lancaster students would receive a similar education in either Oak Grove or Woodland.

¶ 28 Steve Thomas, director of teaching and learning at Woodland, testified that he disagreed with Brown's estimate that Woodland's cohort size for grades six through eight is about 780 students. He explained that Woodland uses a "house" system to reduce the cohort into smaller groups called houses. There are four houses for the first through fifth grades, with about 165 students in each house. There are three houses for the sixth through eighth grades, with about 210 to 320 students in each house. Each house has its own section of the school building, and students conduct their daily school activities with only their house members. He further testified that, although playing interscholastic athletics is more difficult at a larger school district such as Woodland, there is a larger array of other options, such as intramurals and clubs.

¶ 29 Wileen Gehrig, assistant superintendent for instructional services at WHS, testified that the Lancaster students would not receive a better education at LHS than at WHS, because the schools' curricula and AP pass rates are very similar. Gehrig testified that the curricula at WHS and LHS are very similar because they are aligned with the College Readiness Standards and the Common Core Standards. Thus, the two schools teach the same content area skills to students.

¶ 30 Gehrig further testified that 9 of the 15 Lancaster students at WHS take AP classes. Because WHS is larger than LHS, WHS offers more courses and more sections of the same courses, which makes scheduling easier. The courses that WHS offers that LHS does not include: Accounting II, Acting II, World History, Human Geography, Website Development, Outdoor Education/Outdoor P.E., History of Rock and Roll, Biology II, Chemistry II, and Microeconomics. Gehrig explained that students enrolled in AP classes can earn college

---

[2]For example, the five-year average math scores for third graders are 94.6 at Woodland and 98.6 at Oak Grove. The scores for fifth graders are 91.6 at Woodland and 97.2 at Oak Grove. The scores for eighth graders are 92.8 at Woodland and 94.8 at Oak Grove.

credit if they attain a sufficient score on a national exam. WHS's AP pass rate is 89%, and LHS's is 91%. Gehrig opined that these results are very similar.

¶ 31    Al Fleming, associate superintendent for curriculum and instruction at Libertyville, agreed with Gehrig that there are only very minor differences in the curricula at WHS and LHS, such as the electives offered and the number of sections offered. Fleming opined that the Lancaster students in AP classes at WHS would not receive a better education at LHS; they would receive the same education because the exam is a standardized national exam.

¶ 32    As detailed below, the Regional Board found that there would be no discernible academic detriment or benefit to the Lancaster students if the petition were granted, and the trial court upheld this finding, noting that the evidence was conflicting.

¶ 33                              B. Travel Distance and Time

¶ 34    As to travel distance and time, Merchant testified that he prepared petitioners' exhibit No. 11, which showed driving distances and times from Lancaster to the subject schools. He explained that several petitioners drove the specified routes; Merchant did not know if the routes were the same routes that the buses took. The exhibit reflects that the one-way distance and time from Lancaster to the Woodland primary/elementary campus are 5.3 miles and 12 minutes; to the intermediate school are 6.8 miles and 19 minutes; and to the middle school are 6.1 miles and 18 minutes. In contrast, the distance and time from Lancaster to Oak Grove school are 2.1 miles and 5 minutes. The distance and time to WHS's O'Plaine campus are 2.7 miles and 6 minutes and to the Almond campus are 5.8 miles and 14 minutes, whereas the distance and time to LHS are 5.9 miles and 13 minutes.

¶ 35    Maria Earth testified that a roundtrip to Woodland's primary/elementary campus took 15 to 20 minutes. Richard Dahl testified that he drove his sons to school half the days for five years and that it took 15 to 20 minutes roundtrip to the Woodland schools. Joshua Braus testified that the commute to the primary school took 15 minutes. Merchant testified that the commute to Oak Grove was 5 minutes, and Dahl testified that it was 5 to 10 minutes.

¶ 36    Anand Patel testified that Lancaster elementary students are bused to the Woodland schools by four different buses, one for each of the four schools. The buses pick up the students at different times and return them home at different times. Pickup times range from 6:57 a.m. for the middle school students to 8:18 a.m. for the elementary school students. The bus trip from Lancaster to the Woodland schools is about 40 minutes each way. Because there are four separate Woodland school buildings, a Lancaster family with four elementary-age school children could load their children onto four different buses over the course of more than one hour each morning. In contrast, the Oak Grove bus route that serves the Regency Woods subdivision, immediately south of Lancaster, enters that subdivision at about 7:50 a.m. and arrives back at the school at about 8:02 a.m. (a total of about 12 minutes).

¶ 37    Robert Leonard, Woodland associate superintendent, is responsible for Woodland's transportation services. He prepared respondents' exhibit No. 8, which lists the distances and times from Lancaster to Woodland schools, and he traveled the bus routes and recorded the times with the stopwatch feature of his iPhone. Leonard testified that the distance from Lancaster to Woodland's primary/elementary school's campus is 5.4 miles and takes 8 minutes; to Woodland's intermediate school is 5 miles and takes 9 minutes; and to the middle school is 5.3 miles and takes 10 minutes.

¶ 38    Clement testified that, if the petition were granted, the Lancaster students would not be placed on the Regency Woods bus route, because that bus is at capacity. Instead, they would be placed on the Nickels and Dimes subdivision bus route, which is not currently at capacity. The Nickels and Dimes subdivision is farther away than Regency Woods, and the Lancaster students' ride to Oak Grove would be about 10.6 miles.

¶ 39    The Regional Board resolved this issue in the school districts' favor. It found that, if the petition were granted, the only distance that would be significantly shorter would be that from Lancaster to Oak Grove school. The trial court, however, found in petitioners' favor on this issue. The trial court upheld the foregoing finding, but found that the shorter distance from Lancaster to Oak Grove school "is significant" in that it is less than half the distance to the Woodland schools. The trial court also found that the route to Oak Grove school was safer than the routes to the Woodland schools and that the shorter distance to the elementary school was entitled to greater weight than the longer distance to LHS. In the trial court's view, the shorter distance supported a finding that granting the petition would provide an educational benefit to the Lancaster children.

¶ 40                                C. Community of Interest

¶ 41    Although Lancaster is located in Waukegan, the Lancaster homes have a Libertyville mailing address. The Woodland schools are located in Gurnee and Gages Lake. The two WHS buildings are located in Gurnee. Oak Grove has a Libertyville mailing address, but is located in the Village of Green Oaks. LHS is located in Libertyville.

¶ 42    The petitioners who testified at the hearing (Ayaz Merchant, Richard Dahl, Joshua Hornaday, Maria Earth, Joshua Braus, and Dean Vandenbiesen) stated that they consider Libertyville their community of interest. They presented evidence detailing where their family activities occur (petitioners' exhibit No. 11.5, as summarized in exhibit No. 12).[3] Libertyville was the most popular location for children's activities, such as art, ballet, camps, dance, gymnastics, scouting, soccer, library, and preschool/daycare, and Gurnee was second. Libertyville was also the first choice for pharmacies, dry cleaners, and churches. However, the most popular location for grocery stores was Vernon Hills (35%), with Libertyville as the second most frequent destination (21%).

¶ 43    Another exhibit (petitioners' exhibit No. 5) consists of a map showing the locations of Lancaster, the subject schools, nonschool activities, and shopping for Lancaster families. It reflects that no nonschool activity or shopping occurs in the Oak Grove territory.

¶ 44    The school districts presented evidence that there are as many convenient points of interest that could support a community of interest north of Lancaster as there are in Libertyville.

¶ 45    The Regional Board found that the Lancaster students did not have a demonstrably strong community of interest with Oak Grove and Libertyville. It determined that there was no indication that the Lancaster students were declining to participate in academic and extracurricular activities because they were enrolled at their current schools.

_____

[3]This evidence was based on a survey of Lancaster residents conducted by Merchant and in which 60 of the 80 homes participated.

¶ 46    The trial court rejected the Regional Board's determination that petitioners were required to show that granting the petition would increase the Lancaster students' participation in school and community activities. It found that petitioners showed a connection with Oak Grove and Libertyville and that annexation could result in additional opportunities for such activities.

                            D. Home Values

¶ 48    Petitioners presented evidence that granting the petition would increase home values in Lancaster. Elizabeth Bryant, a Century 21/Kreuser & Seiler, Ltd., realtor, testified that she compared Lancaster homes with those in the Regency Woods subdivision. In her report (petitioners' exhibit No. 20), dated October 30, 2012, she stated that the houses in the two subdivisions are comparable for mortgage and refinancing purposes because they have similar construction and layouts. Bryant further stated that "[p]otential buyers look at price range, commute to work and school, test scores and school size." As to sale prices, Bryant stated that Regency Woods homes sold for an average of $125,636 more in the last 24 months. She stated that much of the difference can be attributed to the difference in schools, "as most of the other services are the same." She acknowledged that some of the difference was due to the struggling real estate market, which "hit Gurnee harder than Libertyville." She noted, however, that, even in January 2007, there was a difference of $59,000. The school districts did not present any evidence on this issue.

¶ 49    The Regional Board did not make any findings as to home values. The trial court determined that home values could be considered in assessing educational welfare. It found that petitioners presented evidence supporting their claim that Lancaster property values would increase if the petition were granted, whereas the school districts offered no contrary evidence. The court determined that the Regional Board erred as a matter of law in disregarding petitioners' evidence.

                    E. Petitioners' School Preferences

¶ 51    Petitioners testified that they desired to detach from Woodland and WHS and attach to Oak Grove and LHS.

¶ 52    The Regional Board made no findings on this issue, and the trial court determined that the Board erred as a matter of law in failing to consider petitioners' preferences.

                    F. Regional Board's Decision

¶ 54    In a January 3, 2013, written order, the Regional Board denied the petition. It found that: (1) there would be no financial detriment or benefit to any of the school districts if the petition were granted; (2) there would be no discernible academic detriment or benefit to the Lancaster students if the petition were granted; (3) the only significantly shorter commute (by car or bus) would be from Lancaster to Oak Grove school; (4) there was not a demonstrably strong community of interest between the Lancaster students and the "current students and school and extracurricular activities associated with the Oak Grove and Libertyville schools"; and there was no indication that Lancaster students were declining to participate in academic and extracurricular activities because they were enrolled at their current schools; and (5) despite the lack of financial detriment to the districts if the petition

were granted, petitioners "had not shown enough educational benefit that would inure" to the Lancaster students to overcome the threshold in *Carver v. Bond/Fayette/Effingham Regional Board of School Trustees*, 146 Ill. 2d 347 (1992), and *Pochopien v. Regional Board of School Trustees of the Lake County Educational Service Region*, 322 Ill. App. 3d 185 (2001).

¶ 55    Pursuant to the Administrative Review Law, petitioners appealed to the trial court. 735 ILCS 5/3-101 *et seq.* (West 2012).

¶ 56                                    G. Trial Court's Decision

¶ 57    On November 13, 2013, the trial court found that the Regional Board's decision was clearly erroneous and that the petition should have been granted. In a 35-page memorandum order, the court noted that, because the school districts had stipulated that granting the petition would cause no financial harm to any of the districts, the central issue was whether petitioners sustained their burden of showing that granting the petition would provide "some benefit to the educational welfare of the students in the detachment area," a mixed question of law and fact. *Carver*, 146 Ill. 2d at 358. The court noted that the specific factual issues before it were: educational opportunity, community of interest, travel distance and time, property values, and petitioners' school preferences. It also identified two questions of law: whether petitioners were required to prove that granting the petition would *increase* the Lancaster students' participation in school and extracurricular activities; and whether the Regional Board was required to consider the potential for increased Lancaster property values as an aspect of educational welfare.

¶ 58    Regarding educational opportunity, the trial court ruled that the Regional Board's finding that granting the petition would result in no discernible academic detriment or benefit to the Lancaster students was not against the manifest weight of the evidence. The trial court noted that petitioners presented evidence of educational benefit but that there was also evidence showing that there would be no benefit, because the education provided at all the schools was excellent.

¶ 59    Next, the trial court addressed community of interest. The court initially noted that evidence of shopping and banking preferences failed to justify detachment and annexation. However, it noted that information concerning participation in extracurricular activities showed that the majority of the Lancaster students' activities occur in Libertyville and that Lancaster residents also showed "a strong pattern of religious participation in Libertyville." The court rejected the school districts' assertion that petitioners were *required* to show that granting the petition would *increase* the Lancaster students' participation in school and community activities. After noting that the case law did not support this claim, the court found that petitioners "offered substantial evidence to show their connection with the area served by the Oak Grove and Libertyville school districts, and that the Oak Grove schools are closer for the elementary[-]school-aged children." Reviewing the case law, the court determined that a community of interest with the annexing district must be proved and that proof of specific potential improvements in student participation is helpful, but not necessary, to prove that a child will benefit from attending school in his or her community of interest. The court found that the evidence showed that petitioners actively encouraged their children to pursue extracurricular activities and that they made efforts to stay involved in their children's schooling; therefore, the evidence established that the Lancaster students'

alignment with their community of interest will likely result in additional opportunities for school and extracurricular activities.

¶ 60 The court also took issue with two aspects of the Regional Board's findings on this factor. First, it determined that, to the extent that the Board required proof of current associations with and participation in activities in Oak Grove and Libertyville, the Board applied the incorrect standard. The court noted that petitioners were instead required to show that their natural community of interest was with Oak Grove and Libertyville. It found that they had done so by showing that their children were currently participating in extracurricular activities in Oak Grove and Libertyville and "by demonstrating their own personal and commercial ties to the community." Accordingly, the court found that, to the extent that the Board determined that petitioners did not show a community of interest, that determination was against the manifest weight of the evidence.

¶ 61 Second, the trial court addressed the Regional Board's finding that there was no indication that the Lancaster students were *not* participating in academic and extracurricular activities because they were enrolled in their current schools. The trial court noted that it appeared that the Regional Board required proof that the Lancaster students are currently suffering from a specific detriment (instead of proof of a likely or potential benefit from annexation). Relying on *Pochopien*, the trial court determined that the "standard is without basis in law" and further found that proof of a specific, current detriment "is helpful but not necessary to show community of interest."

¶ 62 Next, the court addressed travel distance and time. It upheld the Regional Board's finding that the only car or bus commute time that would be significantly shorter if the petition were granted would be from Lancaster to Oak Grove school (although the evidence of bus commute time was less clear). However, in contrast to the Regional Board's findings, the court also determined that the shorter distance to Oak Grove school "is significant" because it is less than half the distance to the Woodland schools. Further, the court found that the routes to the "Woodland schools cross through multiple intersections on major streets. The evidence showed that the route to Oak Grove only crosses one intersection significant enough to have a traffic signal. Accordingly, it is not only distance and time, but safety that weighs in favor of granting the petition." The court determined that the shorter distance to Oak Grove school was entitled to greater weight than the longer distance to LHS because, pursuant to case law, the benefit of a shorter and safer commute for younger children is not reduced or negated by a longer distance for older students. The court found that the shorter, faster, and safer ride to Oak Grove school supported a finding, which the Regional Board did not make, that granting the petition would provide an educational benefit to the Lancaster children. The court determined that the Regional Board did not refer to the shorter distance as an educational benefit or indicate that it gave weight to that benefit. Thus, although the Regional Board's finding regarding the distances to the various schools was accurate as a matter of fact, the Regional Board was required as a matter of law to consider and give weight to the overall educational benefit of the younger children's shorter commute. It noted that, had the Regional "Board properly given greater weight to the fact that the younger children in the Lancaster subdivision would have a shorter, faster[,] and safer ride to Oak Grove[,] it is difficult to see how that benefit could be considered 'minimal.' "

¶ 63 The trial court next addressed the impact on property values if the petition were granted, noting that the Regional Board made no express findings as to this factor. It acknowledged

that the supreme court had not mentioned property values as a factor to consider when reviewing a detachment petition. However, the trial court noted that several appellate court cases did do so, most notably *Burnidge v. County Board of School Trustees*, 25 Ill. App. 2d 503 (1960), and that the broad interpretation of educational welfare endorsed by the supreme court in *Carver* and *Board of Education of Golf School District No. 67 v. Regional Board of School Trustees*, 89 Ill. 2d 392 (1982), supported the determination that property values may be considered. Thus, it found that it was contrary to law to ignore evidence on that factor. In this case, the court noted, petitioners offered evidence supporting their claim that property values would increase if the petition were granted. The school districts presented no contrary evidence, and the Regional Board made no findings concerning property values. The court found that the Regional Board "appears to have disregarded evidence that was relevant to the question of educational welfare, and in doing so erred as a matter of law."

¶ 64 Next, the trial court addressed petitioners' school preferences, noting that the Regional Board made no findings on this issue though the evidence showed petitioners' clear preference for detachment and annexation. The trial court determined that, given the other factors (namely, the shorter commute to the elementary school and community of interest) that supported granting the petition, the Regional Board erred as a matter of law in failing to consider petitioners' preferences.

¶ 65 Finally, the trial court summarized its findings. It found that the Regional Board properly determined that granting the petition would not provide the Lancaster children with a discernible academic benefit. However, it also determined that the Regional Board erred by giving no weight to petitioners' school preferences or the impact that granting the petition would have on their property values. Further, the trial court found that the Regional Board erred in its assessment of the evidence concerning petitioners' community of interest and that it gave insufficient weight to the shorter commute to Oak Grove school. Accordingly, the court determined that granting the petition would provide some benefit to the Lancaster students' educational welfare and it reversed the Regional Board's decision.

¶ 66                                    II. ANALYSIS

¶ 67 On appeal, the school districts argue that the Regional Board did not err in: (1) finding that there would be no direct educational advantage to the Lancaster students if the petition were granted; (2) finding that the commute to Oak Grove school is not significantly shorter than the commute to the Woodland schools and does not give the Lancaster students an educational benefit; (3) finding that Lancaster does not have a community of interest with Oak Grove and Libertyville; and (4) failing to consider that granting the petition could cause Lancaster home values to increase. For the following reasons, we conclude that the Regional Board erred in denying the petition, where, although it correctly assessed the educational advantage factor, it erred in assessing (or failed to assess) the distances to the schools, petitioners' "community of interest," the students' participation in school and extracurricular activities, property values, and petitioners' school preferences.

¶ 68 Article 7 of the School Code governs school district boundary changes. Section 7-6(i) of the School Code provides, in relevant part, that, at a hearing on a petition for detachment and annexation, the regional board of school trustees:

"shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the

standards of recognition as prescribed by the State Board of Education, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is to the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted." 105 ILCS 5/7-6(i) (West 2012).

¶ 69     Under section 7-6, a petition for detachment and annexation should be granted only where the overall benefit to the annexing district and the detachment area clearly outweighs the resulting detriment to the losing district and the surrounding community as a whole. *Carver*, 146 Ill. 2d at 356.

¶ 70     The petitioners must prove their case by a preponderance of the evidence. See 5 ILCS 100/10-15 (West 2012). "A *prima facie* case is established by evidence that would enable the trier of fact to find each element of the cause of action more probably true than not." *Board of Education of Marquardt School District No. 15 v. Regional Board of School Trustees*, 2012 IL App (2d) 110360, ¶ 19. Where the opposing party produces no evidence that contradicts or impeaches the burdened party's evidence, the trier of fact must rule for the burdened party. *Pochopien*, 322 Ill. App. 3d at 193.

¶ 71     A regional board's decision on a petition for detachment and annexation is an administrative decision for purposes of the Administrative Review Law. 735 ILCS 5/art. III (West 2012). The scope of our review of an administrative agency's decision extends to all questions of law and fact. *Carver*, 146 Ill. 2d at 355. A board's factual findings are held to be *prima facie* true and correct. *Id.*; see 735 ILCS 5/3-110 (West 2012). However, this rule does not relieve us of our duties to examine the record and to set aside an order that is unsupported by the evidence. *Carver*, 146 Ill. 2d at 355. Reversal of an administrative agency's factual findings is warranted only where they are against the manifest weight of the evidence; that is, where it is clearly evident that the agency should have reached the opposite conclusion. *Marquardt*, 2012 IL App (2d) 110360, ¶ 20. Where administrative orders involve mixed questions of law and fact, we apply the "clearly erroneous" standard of review. *Id.* We review *de novo* an administrative agency's decisions on questions of law. *Id.*

¶ 72     In applying the benefit-detriment test, reviewing courts are to consider: (1) the differences between school facilities and curricula; (2) the distances from the petitioners' homes to the respective schools; (3) the effect that detachment would have on the ability of either district to meet state standards of recognition (and whether a detaching district will remain financially healthy and able to meet the standards); and (4) the impact of the proposed boundary change on the tax revenues of both districts. *Carver*, 146 Ill. 2d at 356-57. Moreover, courts may consider: (1) the "community of interest" and "whole child" factors, *i.e.*, the identification of the petitioning territory with the district to which annexation is sought, and the corresponding likelihood of students' participation in school and extracurricular activities; and (2) the personal desires of the petitioning parents, although more than personal preference is needed to support a change in boundaries. *Id.* at 356. "Physical proximity and natural identification with the community have obvious advantages to a student's educational welfare." *Board of Education of St. Charles Community Unit School District No. 303 v. Regional Board of School Trustees of the Kane County Educational Service Region*, 261 Ill. App. 3d 348, 363 (1994). The "whole child" factor "recognizes that extracurricular participation in social, religious, and even commercial activities is important in a child's development as a beneficial supplement to the child's academic involvement."

*Golf*, 89 Ill. 2d at 397. If a child attends school in his or her natural community, it not only enhances his or her educational opportunity, but encourages his or her participation in social and other extracurricular activities that figure importantly in the "whole child" idea. *Id.* at 398.

¶ 73    The "[m]ere absence of substantial detriment to either district *** is not sufficient to support a petition for detachment and annexation." *Carver*, 146 Ill. 2d at 358. " '[I]t is the *overall* benefit to the annexing district and the detachment area considered *together*' that must outweigh the resulting detriment to the losing district and the surrounding community as a whole." (Emphases in original.) *Id.* (quoting *Golf*, 89 Ill. 2d at 400-01). In "the absence of substantial detriment to either school district, *some benefit* to the educational welfare of the students in the detachment area is sufficient to [warrant] the granting of a petition for detachment and annexation." (Emphasis added.) *Id.*

¶ 74    "Educational welfare" is broadly interpreted. *Id.* at 359. Students' educational welfare is bettered not just through improved educational programs or facilities. *Id.* at 359-60. Improvement can occur by way of a shortened distance between students' homes and their school. *Id.*; see *Pochopien*, 322 Ill. App. 3d at 194; see also *Burnidge*, 25 Ill. App. 2d at 509 ("In addition to the savings in transportation costs, and diminution in time spent daily by children riding a bus, there would be a certain safety factor by reason of diminution of exposure and certainly a lessening of fatigue accompanying a long bus ride to and from school."). A reduction in travel time, however, is not sufficient by itself to warrant granting a boundary change. *Pochopien*, 322 Ill. App. 3d at 194. Further, although relevant, petitioners' personal preferences as to shopping, banking, *et cetera* are not a sufficient basis for granting a petition. *Id.* "Students' educational welfare can also be improved through an increased identification with their 'natural community center,' which would increase participation in school and extracurricular activities." *Id.* at 194-95. By contrast, "an unnatural identification with a school district would have an opposite result with a corresponding loss of participation and resulting poorer educational picture." *Burnidge*, 25 Ill. App. 2d at 510.

¶ 75    Here, the school districts stipulated that none of the school districts would suffer substantial detriment if the petition were granted. Because of the absence of substantial detriment to any school district, only "*some benefit* to the educational welfare of the students in the detachment area is sufficient to [warrant] the granting of a petition for detachment and annexation." (Emphasis added.) *Carver*, 146 Ill. 2d at 358.

¶ 76                                A. Educational Opportunity

¶ 77    The school districts argue first that the Regional Board correctly found (and this finding was upheld by the trial court) that there would be no academic advantage or detriment for the Lancaster students if the petition were granted. Specifically, the districts argue that: (1) the evidence, including Brown's testimony, showed that state report cards cannot be used to compare schools; (2) none of the Lancaster students are of low SES, none failed to meet state standards, and each district's students who are not in either of these categories have similar scores; (3) the Internet rankings of the schools are unreliable because no information was provided about how the rankings were compiled or the bases upon which the schools were ranked; (4) the schools' educational programs are the same, except that WHS offers courses that LHS does not offer; (5) as to the Lancaster students enrolled in AP classes at WHS, the WHS and LHS AP programs follow a national curriculum, and the programs have similar

pass rates; and (6) more weight was properly given to school district administrators' testimony than to nondistrict personnel's testimony, and district personnel testified that the education Lancaster students currently receive is equivalent to what they would receive at Oak Grove and Libertyville.

¶ 78       Petitioners respond that the evidence clearly demonstrated that Oak Grove school and LHS would provide better educational opportunities for Lancaster students than their current schools. They contend that the desired schools scored higher on all criteria in the state report cards (averaged over the four school years from 2008 to 2011). For the elementary and middle schools, Oak Grove school had better scores than the Woodland schools in 84 categories, including: pupil-to-teacher ratio, average years of teaching experience, percentage of expenditures toward instruction and education, and overall testing performance. For the high schools, LHS had better scores than WHS in all 46 categories, including: pupil-to-teacher ratio, average years of teaching experience, percentage of expenditures toward instruction and education, graduation rates, and overall testing performance. Petitioners maintain that the Regional Board erred in ignoring the foregoing uncontroverted evidence and instead relying upon the district administrators' opinions that the schools were essentially equal. Petitioners contend that the Regional Board (and the trial court) essentially found that, because all the districts are good districts, the state report cards and the AYP ratings held no value to determine educational benefit. Regarding the percentages of low SES students at the schools, petitioners argue that, even if this population is removed from the data, Oak Grove's four-year averages are, even by the calculations presented in the districts' brief, ".4 to 5.6 percent higher than Woodland's." Petitioners further contend that the data reflect that the desired school districts present a *better* educational opportunity and that this weighs in favor of finding, in consideration with all of the other relevant factors, "some benefit" (*id.*) to Lancaster students' educational welfare.

¶ 79       In light of the conflicting evidence on educational advantage, we conclude that the Regional Board (and the trial court) did not err in finding that granting the petition would result in no discernible academic benefit to the Lancaster students. Brown identified three factors as determining school quality, but he conceded that parent commitment trumped all other indicators of student success and that petitioners were passionate about their children's education. There was conflicting testimony on the three factors Brown identified–math scores, cohort size, and student engagement. Brown himself conceded that math scores alone do not necessarily reflect a better school environment and are but one factor to assess. The testimony concerning cohort size reflected that Woodland has a higher student enrollment but tries to offset any negative consequences of this fact by dividing the students into houses within the schools.

¶ 80       Petitioners' case relied heavily on the state school report cards. However, the evidence reflected that the overall scores for the schools could not reasonably be compared, due to the schools' diverse populations. Several witnesses testified that the percentage of low SES students, a population that traditionally does not score as high on standardized exams as other students, at WHS was 16% and that it was only 5% at LHS. The percentage of low SES students at the Woodland schools is 29%, whereas it is only 0.1% at Oak Grove school. Clement analyzed report card data for Woodland and Oak Grove. He testified that, excluding the low SES students from the data (because there are no low SES students in Lancaster), the mathematics performance scores are over 90 for grades three through eight. In his view, this

is more of an "apples to apples" comparison, and he opined that Lancaster students would receive a similar education at either district. Even Brown testified that AYP ratings do not necessarily reflect an entire school's success and he stated that he did not focus on this data. He explained that one cannot draw statistical comparisons from test scores, because there are differences in each group's population, although he focused on population size and not economic status.

¶ 81    The testimony concerning AP class availability and enrollment also did not necessarily demonstrate an educational benefit. (This evidence was relevant because 9 of the 15 Lancaster students who attend WHS take AP classes.) WHS is a larger school and offers more AP courses and more sections of the same courses than LHS offers. Gehrig testified that the school's AP pass rates are similar: WHS's is 89% and LHS's is 91%.

¶ 82    As Lea testified, the PSAE subtest scores for the high schools were also very similar, although the percentage of students meeting or exceeding the relevant standards was higher at LHS. Further, the data on pupil-to-teacher ratios also reasonably reflected that there was no significant difference between the high schools. Lea opined that the three-student difference in the ratios was not significant at the high school level. Regarding teacher experience, Lea likewise opined that the two-year average difference for experienced high school teachers did not imply that the LHS students receive a better education. He explained that, after a certain point, additional experience does not necessarily correlate with better teaching.

¶ 83    In *Fosdyck v. Regional Board of School Trustees, Marshall, Putnam, & Woodford Counties*, 233 Ill. App. 3d 398, 409 (1992), the reviewing court reversed, as being against the manifest weight of the evidence, the regional board's finding that detachment would enhance the educational welfare of the children in the detachment area. The court held that the desired school district was larger, offered a wider curriculum, offered extracurricular activities (*i.e.*, sports) not available at the current school and in which the petitioning couple's children wished to participate, and had facilities not available at the current school (*i.e.*, a weight-lifting room, two gymnasiums, and a tennis practice room) and separate buildings for its grade school and high school. *Id.* at 402, 410. Here, in contrast, the evidence reflected less stark differences between petitioners' current schools and the desired schools.

¶ 84    In summary, we conclude that the Regional Board did not err in finding that there would be no discernible educational advantage to the Lancaster students if the petition were granted.

¶ 85                            B. Travel Times and Distances to Schools

¶ 86    The school districts next argue that the evidence showed that the differences in travel times and distances to the Woodland schools versus Oak Grove are *de minimis* and that the Regional Board's finding that the differences are not sufficient to show an educational benefit from detachment is not erroneous. They maintain that the trial court reweighed the evidence and substituted its judgment in finding that the route to Oak Grove school was safer. For the following reasons, we reject the school districts' argument and conclude that the Regional Board's finding on this issue is erroneous.

¶ 87    The trial court agreed with one aspect of the Regional Board's finding: that the only commute (car or bus) that would be significantly shorter if the petition were granted would be from Lancaster to Oak Grove school (but it noted that the question of bus commute time was less clear). Ultimately, the trial court ruled in petitioners' favor on this issue,

determining that the difference in distance to Oak Grove school is "significant" because it is less than half the distance to the Woodland schools and because the routes to the Woodland schools cross multiple intersections on major streets and the route to Oak Grove school crossed only one intersection significant enough to have a traffic signal. Thus, in addition to distance and time, safety weighed in petitioners' favor on this issue. Furthermore, the trial court determined that the Regional Board erred as a matter of law in that it failed to give weight to the educational benefit to the younger children of a significantly shorter, faster, and safer commute to school. The court found that the shorter distance to Oak Grove school was entitled to greater weight than the longer distance to LHS because the benefit of a shorter and safer commute for younger children was not reduced or negated by a longer commute for older students (*i.e.*, students who would attend LHS). Thus, the court determined that the shorter, faster, and safer ride to Oak Grove school supported a finding, which the Regional Board did not make, that granting the petition *would* provide an educational benefit to the Lancaster students.

¶ 88      On appeal, the school districts contend that the Regional Board's finding as to travel times and distances is not erroneous and that it could not find that the commute to Oak Grove school was anything more than nominally shorter. Specifically, they argue that the Lancaster students would not necessarily take a direct route to Oak Grove school if the petition were granted. They point to Clement's testimony that, if the petition were granted, the Lancaster students would not be added to the Regency Woods subdivision's bus route, because that bus is at capacity. Rather, the Lancaster students would be added to the Nickels and Dimes subdivision's bus, which is not currently at capacity. That subdivision is farther from Lancaster than is Regency Woods, and the Lancaster students' bus ride to Oak Grove school would be about 10.6 miles in that event. Thus, in the school districts' view, evidence showed that the Lancaster students would not take the bus route for which petitioners presented evidence and that the one that they would take is not shorter than the routes their current buses take.

¶ 89      The school districts also contend that petitioners' evidence regarding the driving times was inconsistent and inconclusive. First, they note that none of the witnesses who testified concerning petitioners' exhibit No. 11, a chart of the distances and driving times from Lancaster to the Woodland schools, testified that they traveled the route that the school buses traveled. Next, they note that Merchant testified that the trip from Lancaster to Oak Grove school was about 5 minutes, whereas Richard Dahl testified that it was 5 to 10 minutes. They also note that exhibit No. 11 states that the *one-way* drive time to the Woodland primary/elementary school's campus was 12 minutes, to the Woodland intermediate school was 17 to 19 minutes, and to the Woodland middle school was 18 minutes. Maria Earth, however, testified that the roundtrip to Woodland primary/elementary was 15 to 20 minutes (7.5 to 10 minutes one way). Richard Dahl testified that the roundtrip to the primary school was 15 to 20 minutes, but Joshua Braus testified that it was 15 minutes.

¶ 90      The districts next address another aspect of the bus travel times. They assert that petitioners did not meet their burden of showing that the bus travel times to Oak Grove were significantly shorter than those to the Woodland schools. They maintain that petitioners did not present any evidence as to the bus travel times to the Woodland schools and note that even the trial court found that the bus travel time issue was "less clear." The districts rely on Leonard's testimony that, as to respondents' exhibit No. 8, the bus travel time from Lancaster

to Woodland's primary/elementary campus is 8 minutes, to the intermediate school is 9 minutes, and to the middle school is 10 minutes. The districts urge that Leonard's testimony was more detailed than petitioners' witnesses' testimony. In any event, they contend that Richard Dahl's testimony was similar to Leonard's testimony, in that both testified that the one-way travel time to the Woodland primary school was from 7.5 to 10 minutes; this testimony was similar to Maria Earth's testimony. The districts argue that this time is not *significantly greater* than the 5 to 10 minutes to Oak Grove school.

¶ 91 We reject the school districts' argument that any inconsistencies in petitioners' evidence as to travel times and distances warrants finding against them on this factor. Notwithstanding the lack of consistency or precision in the evidence, it is clear that Oak Grove school is about two miles from Lancaster. By contrast, the driving distance to the three Woodland schools is, depending on the source, 3.23 to 6.8 miles. Thus, both the Regional Board and the trial court reasonably found that the distance to Oak Grove school is significantly shorter (by 1.2 to 4.8 miles) than the distances to the Woodland schools. As for the high schools, it is also fairly straightforward to conclude, regardless of the source, that the distance to LHS is slightly longer than to either of the WHS campuses.

¶ 92 The evidence was less than clear as to the bus routes. The school districts control route assignments and as noted they presented testimony that the current bus routes from Lancaster to the Woodland schools are about 5 miles long and take about 8 to 10 minutes and that, if the petition were granted, the Lancaster students would travel over 10 miles on the bus assigned to the Nickel and Dimes subdivision. Without any evidence as to the percentage of students relying on bus versus auto transportation, it is difficult to assess the bus route data. The Regional Board's only finding on travel distances and times is that the "only driving or bus commute time that would be measurably shorter would be from" Lancaster to Oak Grove school. Thus, it appears that even the Regional Board placed little weight on the school districts' assertion that the Lancaster students would be taking a longer bus ride to Oak Grove. We cannot quarrel with its assessment.

¶ 93 We turn next to the central question on this factor, namely, how much weight to place on the shorter commute to Oak Grove school. The school districts note that case law has stated that one of the factors to consider when ruling on a detachment petition under section 7-6(i) of the School Code is the distance from the petitioning area to the respective schools. *Carver*, 146 Ill. 2d at 356. However, they also note that there is no guidance on how much difference in the distances and times is necessary to grant a detachment petition. They suggest that it would be absurd to grant a petition where the travel time to the desired school is only one minute shorter; the districts urge that the differences in distances and times must, instead, be significant.

¶ 94 We agree with the school districts that there is little case law guidance in analyzing distances and times. In *Fosdyck*, the facts were dissimilar to those in this case. There, the reviewing court reversed the regional board's denial of a detachment petition, holding that the petitioners' six children would benefit from a shorter commute if the petition were granted. *Fosdyck*, 233 Ill. App. 3d at 409. The current bus commute was 45 minutes, and the petitioners lived 8.8 miles from the current school and only 4.1 miles from the desired high school. Also, the wife had a business 5 minutes from the couple's home, and the business was only 2.5 blocks from the desired grade school and 6 blocks from the desired high school. *Id.* at 400-01.

¶ 95        Nevertheless, we conclude, as did the trial court, that the Regional Board erred in its analysis of the commute times. The school districts fail to adequately address the point raised by the trial court concerning the weight to be accorded to the Regional Board's finding that the commute to Oak Grove school was significantly shorter. As noted, educational welfare is broadly interpreted and is bettered not merely through improved educational programs or facilities. *Carver*, 146 Ill. 2d at 359-60. It can also improve by way of shortened distances between students' homes and their schools. *Id.* Although a reduction in travel time is not sufficient by itself to justify a boundary change (*First National Bank of Elgin v. West Aurora School District 129*, 200 Ill. App. 3d 210, 217 (1990)), it is a proper consideration. See, *e.g.*, *Board of Education of Jonesboro Community Consolidated School District No. 43 v. Regional Board of School Trustees*, 86 Ill. App. 3d 230, 233-34 (1980) (benefit of shorter distance to school "would be reflected in time, safety, effort, and expense"); see also *Golf*, 89 Ill. 2d at 400 (in holding that a detachment petition was properly granted, court stated that one of the educational benefits in that case was that "[s]tudents from the detachment area would benefit by improved safety conditions in traveling to and from school"). Indeed, improved safety is a natural benefit of shortened commuting times and distances. *Burnidge*, 25 Ill. App. 2d at 509 ("In addition to the savings in transportation costs, and diminution in time spent daily by children riding a bus, there would be a certain safety factor *by reason of diminution of exposure* and certainly a lessening of fatigue accompanying a long bus ride to and from school." (Emphasis added.)). Furthermore, giving more weight to younger students' shortened commute and increased safety, even at older students' expense, is permissible, even preferred, in analyzing this factor:

> "We note that it has previously been held that it is proper to give greater weight to the distance issue concerning younger children even if the proposed action increases the distance traveled by older children. (*Board of Education of Community High School District No. 94 v. Regional Board of School Trustees* (1992), 242 Ill. App. 3d 229, 613 N.E.2d 754.) *** Obvious benefits would result from the shorter distance traveled, including advantages in time, safety, effort, and expense. *Board of Education of Jonesboro Community Consolidated School District No. 43 v. Regional Board of School Trustees* (1980), 86 Ill. App. 3d 230, 407 N.E.2d 1084." *Seelhoefer v. Regional Board of School Trustees*, 266 Ill. App. 3d 516, 521 (1994).

See also *Community High School District No. 94*, 242 Ill. App. 3d at 242 (upholding the regional board's granting petition and placing greater weight on the younger students' shorter commutes than the older students' longer commutes); *Board of Education of Avoca School District No. 37, Cook County v. Regional Board of School Trustees*, 82 Ill. App. 3d 1067, 1073-74 (1980) (upholding grant of detachment petition and the regional board's "election to have younger children traveling a shorter distance to and from elementary school and older children traveling the farther distance to junior high school").

¶ 96        Here, the Regional Board failed to take into consideration the import of the shorter commute for the younger Lancaster students and, thus, erred as a matter of law. See *Seelhoefer*, 266 Ill. App. 3d at 521 (holding that the regional board erred in denying detachment petition where, if the petition were granted, the elementary school students would be closer to their new school, even though the high school students would be 1 or 2 miles farther from their school, and the bus ride would decrease by 30 to 45 minutes in the new

territory; shorter distance traveled would result in "advantages in time, safety, effort, and expense").

¶ 97    We finally reject the school districts' claim that the case law required petitioners to show that the current routes are unsafe. The cases upon which the districts rely do not require such a showing, even where they rely upon improved safety conditions in holding that detachment petitions should have been granted. See *Pochopien*, 322 Ill. App. 3d at 195 (holding that the regional board's denial of petition was against manifest weight of the evidence where there was evidence that commute to current school was "extremely onerous" due to heavy traffic and that duration of commute *prevented* some students from participating in after-school activities); *Board of Education of Golf School District No. 67, Cook County v. Regional Board of School Trustees*, 88 Ill. App. 3d 121, 130 (1980) (evidence showed that, while traveling to current school, students had to cross high-traffic intersection that presented safety concerns), *aff'd*, 89 Ill. 2d at 400 (holding that "[s]tudents from the detachment area would benefit by improved safety conditions in traveling to and from school"); *Avoca*, 82 Ill. App. 3d at 1073-74 (in upholding the regional board's grant of detachment petition, reviewing court did not rely on evidence of accident reports concerning route to current school; instead, it affirmed the regional board's determination that the elementary school children's traveling a shorter distance to the desired school and avoiding "congested traffic routes" outweighed the increased distance to the desired junior high school).

¶ 98    In summary, the Regional Board erred in its assessment of the travel times and distances to the schools at issue and should have resolved this factor in petitioners' favor.

¶ 99                    C. "Community of Interest" and the "Whole Child" Factors

¶ 100    Next, the school districts contend that we should uphold the Regional Board's findings that: (1) there was not a demonstrably strong community of interest between the Lancaster students and the students and school and extracurricular activities located in the communities served by Oak Grove and LHS; and (2) the Lancaster students were not declining to participate in academic and extracurricular activities because of their enrollment at their current schools. We reject the school districts' arguments.

¶ 101    The trial court disagreed with the Regional Board's determination that petitioners were required to show that granting the petition would result in *increased* student participation in school and community activities, and it rejected the Regional Board's determination that petitioners had to show that their children were currently suffering from a specific detriment (instead of proof of a likely or potential benefit from annexation). The court found that petitioners presented substantial evidence showing their connection to the area served by Oak Grove and Libertyville. It further determined that the Lancaster parents actively encouraged their children to participate in various activities and made efforts to be involved in their schooling; thus, the alignment of the Lancaster students with their community of interest would result in additional opportunities for school and extracurricular activities.

¶ 102    Here, as to their first argument, the school districts assert for the first time on appeal that none of the Lancaster students' activities occur in the Oak Grove area and, thus, the Regional Board's findings were not clearly erroneous. *Marquardt*, 2012 IL App (2d) 110360, ¶ 29. They note that Oak Grove school is located in the Village of Green Oaks and that LHS is located in Libertyville. Thus, in their view, petitioners had the burden of showing that Lancaster has a community of interest with *both* Green Oaks *and* Libertyville. The evidence,

- 21 -

the school districts argue, showed that most of Lancaster's community activities occur in Libertyville, that some of them occur in Gurnee and Vernon Hills, and that *none* occur in Green Oaks (although the school districts' point-of-interest exhibit showed no locations in Green Oaks; instead, it listed services only in Waukegan and Gurnee). Accordingly, they argue, petitioners failed to establish a *prima facie* case as to a community of interest with Green Oaks.

¶ 103    Issues not raised before an administrative agency are forfeited and cannot be raised for the first time on review. *Community High School District No. 94*, 242 Ill. App. 3d at 234. The school districts argue that forfeiture is a limitation on the parties and not on a court's jurisdiction and that we may relax the rule to maintain a uniform body of precedent or where the interests of justice require. See *Kimble v. Illinois State Board of Education*, 2014 IL App (1st) 123436, ¶ 80. Here, the districts' argument is forfeited. They had the opportunity to raise it before both the Regional Board and the trial court, but failed to do so. Forfeiture aside, we note that LHS's area encompasses Green Oaks.

¶ 104    The school districts' second argument is that the Regional Board correctly rejected petitioners' arguments because petitioners did not present any evidence of a likelihood that attending Oak Grove school and LHS would *increase* the Lancaster students' participation in school and community activities. They assert that petitioners did not identify any school or community activity in which the Lancaster students would participate (and in which they do not already participate) if the petition were granted.

¶ 105    Petitioners respond that case law required them to show only the *possibility* of increased participation in extracurricular activities, not to definitively show the likelihood of increased participation. Petitioners note that the evidence overwhelmingly showed that the Lancaster students participate in activities centered in Libertyville. Although the school districts offered evidence that Lancaster families *could* shop, worship, and participate in activities north of Lancaster, the overwhelming evidence reflected that Lancaster did *in fact* identify with Libertyville, not with Waukegan or areas north of Lancaster. In petitioners' view, the Regional Board should not be in the business of telling people where to play and worship; it should be required to democratically respect residents' actual communities of interest.

¶ 106    Contrary to the school districts' assertions and the Regional Board's findings, the case law did not require a showing that the Lancaster students are currently declining to participate in any activities or that they will actually increase their participation if they attend their desired schools. In *Carver*, the supreme court recited the "whole child" and "community of interest" factors: "the identification of the petitioning territory with the district to which annexation is sought, and *the corresponding likelihood of participation* in school and extracurricular activities." (Emphasis added.) *Carver*, 146 Ill. 2d at 356, 361 (further determining that there was no evidence that the children in that case "ha[d] ties to that area or that this in any way facilitates the students' involvement in school or extracurricular activities"). In *Golf*, the supreme court stated: "If a child attends school in his natural community it enhances not only his educational opportunity but *encourages his participation* in social and other extracurricular activities that figure importantly in the 'whole child' idea." (Emphasis added.) *Golf*, 89 Ill. 2d at 398. Elsewhere in the opinion, the *Golf* court stated that the record reflected that students "from the detachment area would benefit by improved safety conditions in traveling to and from school and by *enhanced opportunities* to participate in school, extracurricular, and community activities." (Emphasis

added.) *Id.* at 400. The *Golf* court also quoted the statement from *Burnidge* that more important than benefits of increased safety and savings in transportation costs and time "is the fact that an identification with a school district in a child's natural community center will *inevitably result in increased participation* in school activities by the child and his parents. Such *increased* participation cannot but result in an improvement in the educational picture of the entire area." (Emphases added.) *Burnidge*, 25 Ill. App. 2d at 509-10. In *Marquardt*, the court held that the petitioners failed to present evidence of the students' participation in any community or other activities or suggesting that "they *** would be *more likely to participate* in school and extracurricular activities in" their desired districts. (Emphasis added.) *Marquardt*, 2013 IL App (2d) 110360, ¶ 32; see also *Pochopien*, 322 Ill. App. 3d at 194-96 (citing *Carver* and *Burnidge* for the proposition that increased identification with the natural community of interest increases participation in school and extracurricular activities, and holding that the school board's decision was against manifest weight of the evidence where the duration of the students' commute prevented them from participating in after-school activities and annexation to the desired district "would facilitate" students' participation in extracurricular activities).

¶ 107    We conclude that the Regional Board erred in finding that there was not a demonstrably strong community of interest between the Lancaster students and their desired schools. This finding resulted from the Board's erroneous determination that petitioners were required to show that their children were declining to participate in any activities or that they would actually increase their activities if the petition were granted. Petitioners were required to show only an identification with their desired areas, and the evidence that they presented was overwhelming. The only evidence that the school districts offered to contradict this was their chart showing that similar services were available in the detachment area, not that petitioners actually patronized them.

¶ 108    In summary, the Regional Board erred in its assessment of the "community of interest" and "whole child" factors.

¶ 109                          D. Property Values

¶ 110    The school districts' final argument is that a potential increase in Lancaster property values, a factor that the Regional Board did not consider, is not a permissible consideration in determining whether to grant a detachment petition. They urge that property values would not affect the quality of education the Lancaster students will receive or directly affect the schools in question. The districts contend that, at most, a potential increase in property values might reflect the public's perception of the schools involved, but that perception is most likely based on the schools' state report cards. The districts further argue that, although *Burnidge*, upon which petitioners rely and which was decided in 1960, considered property values in reviewing a detachment petition, the supreme court, in both *Golf* and *Carver*, did not list property values as a factor to consider. They further contend that this court did not mention property values in *Marquardt*, which was decided in 2012. For the following reasons, we reject the school districts' argument.

¶ 111    In *Burnidge*, this court held that detachment should have been allowed where, among other reasons, there would have been an appreciation in the value of the territory in question. *Burnidge*, 25 Ill. App. 2d at 510. The territory in question was in the Plato school district and consisted of 110 acres of undeveloped land, and the petitioners sought to have it attached to

the Elgin school district and to subdivide and develop it. *Id.* at 504. In concluding that the school board's denial was erroneous, we considered the potential change in land values in determining that there was an educational benefit to detachment:

> "Not only would the community suffer from an educational standpoint, but the action of the board would result in a depreciation of value of the territory in question. This fact has a direct impact on the educational welfare of the community for it is upon the basis of the value of property that funds are made available for school purposes. \*\*\* [The fact that property values could increase $500 per lot if the property were annexed] alone would result in a substantial increased assessed valuation available for taxation for school purposes. Thus, it can be seen that while no detriment can be shown to anyone by allowance of the petition, in addition to the factors already discussed, there would be a revenue benefit if the property is annexed to the Elgin District. Then too, the fact of the appreciation in value is persuasive as demonstrating the soundness of the contention that this territory is naturally and properly a part of the Elgin District for educational purposes." *Id.* at 510.

¶ 112   In *Bloom Township High School District No. 206 v. County Board of School Trustees*, 59 Ill. App. 2d 415, 424-25 (1965), the First District considered *Burnidge*'s language concerning property values, but it ultimately distinguished the case and upheld the school board's findings because there was conflicting testimony concerning property values. See also *Board of Education of Community Unit School District No. 300, Kane, Cook, McHenry & Lake Counties v. County Board of School Trustees*, 60 Ill. App. 3d 415, 421-22 (1978) (without extensive analysis and without citing *Burnidge*, holding that evidence was sufficient to support school board's grant of petition, including evidence of the effect on the petitioners' property values). In *Marquardt*, this court considered the average home values in the territories at issue in the context of assessing the detriment–specifically, the impact on tax revenue–to the detaching districts. *Marquardt*, 2012 IL App (2d) 110360, ¶¶ 27-28.

¶ 113   We disagree with the school districts' assertion that the fact that the supreme court did not explicitly list property values as a proper consideration in detachment proceedings precludes us from considering this factor. There is no language in either *Carver* or *Golf* that the factors discussed therein are exclusive. Indeed, in *Carver*, the supreme court stated that educational welfare is broadly interpreted. *Carver*, 146 Ill. 2d at 359. We note that, if a detachment petition is granted and property values subsequently increase in the detachment area, this increases the tax revenues of the annexing district, which impacts its educational programs and facilities. *Id.* at 359-60 (discussing broad interpretation of educational welfare and noting that petitions have been granted where the annexing district had more modern classrooms and better facilities).

¶ 114   These considerations, in addition to the fact that *Burnidge* remains good law, lead us to conclude that the Regional Board erred as a matter of law in failing to consider the evidence concerning property values. Further, petitioners presented uncontroverted evidence that, as realtor Bryant testified, there was a $125,636 sales price difference between Lancaster and Regency Woods in the two-year period she reviewed and that much of the difference can be attributed to the difference in schools (*i.e.*, test scores and school sizes). This difference cannot reasonably be viewed as *de minimis* and insufficient to affect the educational welfare of the Lancaster students, as the school districts suggest.

¶ 115    The Regional Board erred in not considering property values, a factor that weighed in petitioners' favor.

¶ 116                                    III. CONCLUSION

¶ 117    Based on our holdings as to the travel times and distances to the schools at issue, the "community of interest" and "whole child" factors, and property values, plus the fact that the evidence on petitioners' preferences was uncontroverted, and despite the fact that we uphold the finding *against* petitioners on the educational advantage factor, we conclude that the evidence showed that granting the petition will provide some educational benefit to the Lancaster students. The Regional Board erred in finding otherwise and denying the petition.

¶ 118    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 119    Affirmed.